**ADANTÈ D. POINTER, ESQ., 236229**
**PATRICK M. BUELNA, ESQ., SBN 317043**
POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
155 Filbert Street, Suite 208
Oakland, CA 94607
Tel: 510-929-5400
Website: www.LAWYERSFTP.COM
Email: APointer@LawyersFTP.com
Email: PBuelna@LawyersFTP.com

Attorneys for Plaintiff(s)

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDY WOOD,<br><br>    Plaintiffs,<br><br>v.<br><br>CITY OF SACRAMENTO, a municipal corporation; LEAH ANTONETTI, in her individual capacity as a law enforcement officer for the Sacramento Police Department; and DOES 1-50, inclusive. | Case No.: 2:20-cv-00497-WBS-DB<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION**<br><br>DATE: Jan 23, 2023<br>TIME: 1:30 PM<br>CRTRM: 5 |

**PLEASE TAKE NOTICE** that on **January 23, 2023** at **1:30 PM,** or as soon as this matter may be heard in front of the Honorable Judge **William B. Shubb** in the United States District Court, Eastern District, Sacramento Division, Plaintiff Brandy will move for partial summary adjudication against the Defendants as to the liability portion of the Fourth Amendment unlawful seizures and excessive force claims and correspondent state claims pursuant to Federal Rules of Civil Procedure, Rule 56.

I. **STATEMENT OF FACTS**

On March 18, 2018, Stephon Clark, a 22-year-old African American male, was killed by Sacramento police officers. Nearly a year later, the Sacramento District Attorney announced that the shooting officers were cleared of all criminal charges. The Sacramento Police Department anticipated that a protest would occur in the days leading up to the DA announcement and the District Attorney provided the department a warning ahead of time to allow them to prepare.

SPD Deputy Chief Leong drafted and issued an operations and staffing plan to manage the protest that explicitly permitted both spontaneous and/or planned protest to occur. (Declaration of Patrick Buelna "Buelna Decl.", **Ex. 1** – Operations Plan). Both the SPD Operational Plan and the SPD Policy (**Ex. 2** – SPD Crowd Control Policy) instructed officers to ensure that any dispersal orders were made loud enough for protestors to hear, give them a reasonable time to comply and instruct them on a path to safely exit so they would not be arrested.

1. **The Protest**

According the Sacramento Police Department, the protest began on March 4, 2019 at 6:42 PM with people assembled at in front of Trader Joe's and CVS Pharmacy at the intersection of 50th St / Folsom in Sacramento CA. (**Ex. 3** – Deposition of Norm Leong "Leong Depo", 41; **Ex. 4 -** SPD PowerPoint on Protest). From there, peaceful protestors marched for approximately 2 ½ hour taking a path that returned them to that very same intersection of 50th St / Folsom in Sacramento CA at approximately 8:58 PM. (Leong Depo, 49-50, 52; SPD PowerPoint). The only evidence of any crimes taking place were two small incidents of car vandalism, a flare was lit, an argument took place and a person knocked off a person's "MAGA" hat. (Leong Depo, 21-24).

Once protestors had re-assembled at 50th St / Folsom, the Sacramento Police Department made dispersal orders from approximately 9:09 – 9:40 PM to the crowd of people. (Leong Depo, 49-50, 52; SPD PowerPoint). Defendant SPD Officer Leah Antonetti's body-worn camera captured the dispersal orders, including the final one which repeated the following:

"I am Officer Beal. A police officer with the Sacramento Police Department. Due to the act of vandalism and criminal activity associated with this march. I hereby declare this to be an unlawful assembly and in the name of the people of the State of California order all those assembled at 50th St and Folsom to disperse immediately. If you do not disperse, you may be arrested or subject to other lethal or less lethal munitions, chemical agents or electrical devices. Those who remain risk serious injury. (**Ex. 5 -** Leah Antonetti Body Worn Camera "Antonetti BWC" at 2:24:30-2:25:10)

There were no instructions on what path, direction or street the protestors must disperse. There was no instruction that it was prohibited to leave, walk or go back to their cars/homes on 51st or any other 51st. The sole instruction was to disperse from the intersection. (Id.)

Less than 2 minutes later, the order came to mass arrest anyone at the intersection. (Id at 2:27:00). Nevertheless, SPD Officers continued to provide dispersal orders – and allegedly the opportunity to compel without arrest – that instructed protestors to disperse which many did – including Plaintiff Brandy Wood. (Id. at 2:27:00-2:30:00) Many protestors were dispersing down 51st including Ms. Wood and Minister Pamela McNally-Anderson with "The Poor People's Campaign". (**Ex. 6 –** Deposition of Pamela McNally-Anderson "Anderson Depo", 8-9)

2. **Minister Pamela McNally Anderson**

Minister McNally Anderson is a minister in the Sacramento Area. (Id.) She is a part of a clergy group called "Sacramento Act Area Congregations Together". (Id). The clergy group received knew that a protest was going to occur that night and to show up so she did to support her community. (Anderson, 9-10).

She was at the protest from approx.. 6:30 – 8:00 PM and found it to be peaceful and organized with about 200 people then left. (Anderson, 11-13). She never witnessed any vandalism or physical fighting. (Anderson, 15). At one point she saw residents and protestors briefly arguing with each other from approx. 20-30 feet but nothing other than that. (Anderson 16-17).

She returned around 9 PM because the clergy group asked her to return. (Anderson 12-13). When she returned she went to the Trader Joe's parking lot where she saw seven other clergy members. (Anderson 19-20). When she returned the second time she witnessed no fight or vandalism either. (Anderson 23).

When Anderson was standing there, she believed she heard the first dispersal order around 9:30 PM but it was muffled and she could not understand it. (Anderson 20-21). She heard 4-5 more as moved around over about 30 minutes and recalled it simply being "This is an unlawful gathering. Disperse now." (Anderson 22, 24). However she could not hear it well due to the helicopter and people screaming. (Anderson, 26). Furthermore, she heard it because she had moved closer to the line of officers "but if you weren't close to that, it would have been difficult to her." (Anderson, 30-31).

During that time, she heard people asking how to leave because they were surrounded and felt like they could not get to their cars. (Anderson 27-28). **Furthermore, she even heard a minister negotiate with police for a couple minutes to let protestors disperse while they were still in the parking lot –** *despite the dispersal orders.* **(Anderson Depo, 28).**

When they moved away from the Trader Joe's and onto 51st Street she heard more dispersal orders but they were completely muffled by the helicopter. (Anderson, 30).

When they were walking down 51st street, she though "this is good, you know, get people moving, let's help people get to their cars." (Anderson, 31). The only force she witnessed while they walked was that:

> "we were wanting to go off streets, and now, they were blocked. And now, we can't disperse. So as we went down, I thought okay, good, people can peel off and be able to get to their cars and, like, this will just sort of peacefully resolve itself. But then, now, it's blocked. Now, we can't disperse, and now, we're being forced on to the bridge."

And that was the first time she heard officers say you cannot leave was on the bridge at 51 St where they were trying to cross the bridge. (Anderson 26). She remembered standing next to Brandy Wood and trying to comfort her. (Anderson 45).

Ms. Anderson also recalled when Defendant Antonetti rammed the front tire of her bicycle into her chest, telling Defendant Antonetti that she was clergy and hurting her, then Defendant Antonetti shoved the bike into her chest again. (Anderson 49-51).

### 3. Plaintiff Brandy Wood

Plaintiff Brandy Wood was a 43 years-old African-American mother who attended the protest with her daughter-in-law. (**Ex. 7 –** Deposition of Brandy Wood "Wood Depo", 32-33). She felt it was her duty to attend the protest as a black woman and mom. (Wood Depo, 75).

After protesting through the neighborhood they arrived back at the Trader Joe's. (Wood Depo, 76). The first time she heard dispersal orders occurred when she was trying to leave the protest from Trader Joe's. (Wood Depo, 76). She remembered officers simply saying, "Disperse." (Wood Depo, 77). At that point, she felt like she could not even leave the Trader Joe's parking lot and an officer even told her they could not leave now. (Wood Depo, 79). Plaintiff recalled "everyone" asking how to leave but the officers blocked their paths. (Wood Depo, 80). It was made clear to her that she was not free to leave from the Trader Joe's parking lot despite the dispersal orders. (Wood Depo, 80).

Plaintiff recalled that officers injured her on 51st Street after the Trader Joe's parking lot. The officers had actually pushed the protestors onto 51st Street, blocking their exits and contradictorily instructing them to disperse. (Wood Depo, 83-84). Plaintiff recalled being injured on the bridge when Defendant Antonetti rammed her into the crowd she was with and

bent her foot breaking it. (Wood Depo, 90-91; Antonetti BWC at 3:06:40-3:08:00). Plaintiff can be heard saying she was tripped and injured. (Id.) Defendant Antonetti did – in fact – fracture Plaintiff's ankle. (Id.)

Furthermore, Defendant Antonetti's body-worn camera captured protestors complaining that officers had directed them onto 51st to disperse and that she was restricting them from leaving anyhow. (Antonetti BWC at 3:06:40-3:08:00). Defendant Antonetti rammed her bike into the crowd to keep everyone from leaving. (Antonetti BWC at 3:06:40-3:08:00). Later Plaintiff Brandy Wood was formally handcuffed and arrested on the bridge with the 83 other people corralled there. (Wood Depo, 139).

4. **Defendant Leah Antonetti**

Defendant Leah Antonetti was assigned to monitor the protest as a bicycle officer. (**Ex. 8** – Deposition of Leah Antonetti "Antonetti Depo", 35). At one point she rode back to the Trader Joe's at the end of the protest when Officer Beal was issuing dispersal orders. (Antonetti Depo, 92). She heard Ofc. Beal issuing dispersal orders and understood they were going to make an encirclement with mass arrest. (Antonetti Depo, 92). Even though they were given multiple dispersal orders and arrests were ordered they were still to be allowed the opportunity to leave and not be arrested. (Antonetti Depo, 84-86).

Defendant Antonetti understood that protestors had to be given an opportunity to comply with the dispersal order from the intersection but did not recall hearing the dispersal orders informing the protestors what path they had to take to leave and avoid arrest. (Antonetti Depo, 93).

Defendant Antonetti agreed that there was no effort made to discern people that were trying to leave in compliance with the dispersal order and staying to protest in violation. (Antonetti Depo, 98). Defendant did not know if the people she was keeping from leaving happened to be walking by or were violating the order. (Antonetti Depo, 98).

In fact, she agreed that there were protestors that were telling her that officers had instructed them to go in the direction of 51st to disperse but she refused to allow to leave anyhow. (Antonetti Depo, 99; 114-115). She also refused to allow dispersal of people despite multiple pastors attempts to negotiate that people had been trying to comply and gotten captured on the bridge by officers. (Antonetti Depo, 103). In fact she confirmed that there was **no effort** made to discern whatsoever the law abiding citizens that were peacefully protesting and dispersing from those the violated the dispersal order. (Antonetti Depo 104-105). She agreed that Ms. Wood was apart of the protestors she refused to allow leave. (Antonetti Depo, 109).

5. **Deputy Chief Norm Leong**

Deputy Chief Norm Leong wrote the operations plan for the protest that permitted both planned and spontaneous protests related to the Sacramento District Attorney's decision on the Stephon Clark shooting. (**Ex. 3 –** Leong Depo, 14). He was also responsible for the decision to issue the dispersal order of the protest. (Leong Depo, 14-15).

Deputy Chief Leong was the incident commander for the protest and monitored the protest. (Leong Depo, 14). During the protest he learned of four incidents of possible criminal activity (1) protestors arguing with residents, (2) protestors knocked a baseball cap with "MAGA" written on it off a person; (3) a person had lit a flare which extinguished later; (4) someone had possible keyed some cars on the street. (Leong Depo, 21-24). All of the situations resolved themselves with law enforcement intervention and no one was arrested related to any of the incidents. (Id.)

Deputy Chief Leong wrote into the operations plan for the protest warning officers that when issuing dispersal orders that they need to provide a "clear" avenue or direction for the protestors to disperse because they do not want people that are complying with the dispersal order to be mixed in with the violators. (Leong Depo, 27-28). Deputy Chief Leong agreed the reason to provide a direction for people protesting to disperse is so that law-abiding peaceful

protestors have a way to properly disperse and not be unlawfully arrested or mixed in with those violating a dispersal order. (Leong Depo, 29).

Deputy Chief Leong testified trying to comply or complying with a dispersal order is not a basis to make an arrest of a person. (Leong Depo, 30). Deputy Chief Leong testified that he understood some people had been allowed to leave to their cars during dispersal order and they were waiting for more resources to make arrests at the end of the night. (Leong Depo, 54-56). He also knew that the dispersal orders were given at 50th St / Folsom but the arrest were made on 51st Street on the bridge. (Leong Depo, 54-56; 62-63).

They made these arrest by simply riding bicycles in front of a large group leaving 50th St / Folsom by way of 51 St and trapping them on the overpass. (Leong Depo, 62-63). Deputy Chief Leong did not know if there were any efforts made to discern if the 84 people arrested on the overpass bridge were simply walking home/to their cars or violating the dispersal order. (Leong Depo, 64-65).

6. **Sacramento Police Department Training**

Defendant City designated Lt. Kaneyuki the person most knowledgeable under FRCP Rule 30 (b)(6) for Defendant Antonetti's training related to crowd control, protests and First Amendment assemblies. (**Ex. 9** – Deposition of Brent Kaneyuki "Kaneyuki Depo", 8-9).

Lt. Kaneyuki agreed that even when a supervisor issues an order for a subordinate to make an arrest, the subordinate may not make the arrest without probable cause. (Kaneyuki Depo, 19). Furthermore, Lt. Kaneyuki confirmed that when protestors are given dispersal orders they must be given clear avenues of direction for dispersal and officers may not cutoff dispersal avenues then arrest protestors for failing to disperse. (Kaneyuki Depo, 27).

II.     ARGUMENT

A. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) .

"[W]here there is video evidence of the incident giving rise to the excessive force claim, a court must '**view the facts depicted by the videotape**.'" *See Kollin v. City of Tehachapi,* 2020 U.S. Dist. LEXIS 101995 *1, *28 (E.D. Cal.  June 10, 2010) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). Plaintiff Jeffrey Drevdahl's cell phone video is undisputed video evidence and thus must be taken as true at the summary judgment stage. *See Anthoine v. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010).

**B. DEFENDANT ANTONETTI SEIZED PLAINTIFF**

The Fourth Amendment protects people "against unreasonable searches and seizures" from government actors such as law enforcement officers. U.S. Const., Amend. IV; *See Burdeau v. McDowell,* 256 U.S. 465, 475 (1921). Not all police interactions involve a seizure – a seizure occurs only when a police officer, "by means of physical force or show of authority ... in some way restrain[s] the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968).

In order to determine whether a seizure took place the proper inquiry is an objective one: "[a]s long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported

by reasonable suspicion of criminal activity." *United States v. Laboy*, 979 F.2d 795, 798 (10th Cir.1992). The subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis. *Whren v. United States*, 517 U.S 806; *United States v. Madrid*, 30 F.3d 1269, 1276 (10th Cir.), cert. denied, 513 U.S. 1007, 115 (1994).

A consensual encounter is not a seizure and is consensual so long as a reasonable person would feel free "to disregard the police and go about his business," *California v. Hodari D.*, 499 U.S. 621, 628 (1991); however, an encounter will convert into a seizure (detention) when a reasonable person would believe that he or she is not "free to leave." *Florida v. Bostick*, 501 U.S. 429, 435 (1991). Important factors to consider in determining when an encounter has turned from consensual to a seizure are an officer's "use of language or tone of voice indicating that compliance with officer was compulsory" or "some physical touching by an officer". *U.S. v. Laboy*, 979 F. 2d 795, 799 (10 Cir. 1992).

Here it is indisputable that Brandy Wood and others were "seized" for purposes of the Fourth Amendment in the Trader Joe's parking lot and – again – on the bridge at 51st Street. Furthermore, multiple witnesses testified that protestors were told, intimidated or blocked off from leaving both at the Trader Joe's Parking Lot, along 51st Street and on the overpass. Finally once Plaintiff was on the overpass, Defendant Antonetti explicitly told Plaintiff she was not free to leave and used her bicycle to keep her from dispersing.

For the aforementioned reasons – as a matter of law – Defendant Antonetti had **seized** Plaintiff at the Trader Joe's parking lot, along 51st Street and on the bridge.

### C. DEFENDANT ANTONETTI ENFORCED AN UNREASONABLE SEIZURE

Moreover, "'an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983.'" Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001) (quoting Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1988)). It is well established that

seizures that "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). "Probable cause requires only a fair probability or substantial chance of criminal activity, and [courts] determine the existence of probable cause by looking at 'the totality of the circumstances known to the officers at the time.'" *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002) (quoting *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001)). "Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).

In the context of First Amendment assemblies only "when compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protestors, **but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order.**" See *Barham v. Ramsey,* 434 F.3d 565, 575 (D.C. 2006) (denying qualified immunity in arrest of undifferentiated park protestors); *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C.Cir.1977).

Here, both officers' training and the dispersal orders given were to explicitly disperse protestors from 50th St / Folsom and be arrested if they remained at the intersection. It is undisputed that Plaintiff and others proceeded onto 51st street in efforts to disperse but were

kept from dispersing on side streets, corralled onto the bridge – even after being told to go that direction – and arrested anyhow. Notably SPD provided training that protestors cannot be arrested for trying to comply with a dispersal order.

Here, not only was an arrest made but Defendant Antonetti used actual force to effect the arrest and fractured Plaintiff's leg when she struck her with the bike – which was inherently unreasonable since she lacked probable cause.

Indeed, the Ninth Circuit in *Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir,. 1990) upheld a district court's summary judgment in favor of plaintiffs as to liability of an officer for making an unlawful arrest. In *Duran*, officers were dispatched to a hotel bar for an unruly patron. *Duran*, 904 F. 2d, at 1374. At the bar, plaintiff Duran and the officer Aguilar exchanged heated words, but Duran left the bar. (Id.) Duran's wife drove him home and on their way Duran made an obscene gesture as they passed Aguilar, who noticed it. (Id.) Ofc. Aguilar Duran and followed him home into a mobile home park. (Id.)

Aguilar initiated a traffic stop and ordered Duran to step away from the car. (Id.) Duran told the officer he did not have to and began using profanities. (Id. at 1374-1375). In response, Ofc. Aguilar decided to arrest Duran for disorderly conduct and a scuffled ensued causing Duran a dislocated elbow. (Id. at 1375). The district court granted Plaintiff's motion for partial summary adjudication for an unlawful seizure on the liability issue. (Id.) The Ninth Circuit noted that as "[i]narticulate and crude as Duran's conduct may have been, it represented an expression of disapproval toward a police officer with whom" it was not an arrestable offense and affirmed the unlawful seizure. (Id. at 1378).

Here, Plaintiff was walking home after peacefully protesting and in compliance with a dispersal order to leave 50th St / Folsom. She even told Defendant that she had been told to go

this direction before she was struck. *See Thompson,* 319 F.3d at 935 (whether probable cause exists "turns on the information known to the officers at the moment the arrest [was] made, not on subsequently received information").

### D. DEFENDANT ANTONETTI WAS NEGLIGENT

"[P]ublic employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions." *Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622, 628-29 (2013). Thus, to support a negligence finding, a plaintiff must show that the defendant public employee had a duty to exercise due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury. (Id.) The analysis for excessive force under negligence is the same as the Fourth Amendment. (Id.) And "[t]he reasonableness of an officer's conduct is determined in light of the totality of the circumstances." (Id.)

Excessive force used by a police officer at the time of the arrest is not within the performance of the officer's duty. *Susag v. City of Lake Forest,* 94 Cal.App.4th 1401, 1409 (Cal.Ct.App.2002); *People v. Olguin*, 119 Cal.App.3d 39, 45-46 (Cal.Ct.App. 1981) ("[A]n arrest made with excessive force is equally unlawful. '[It] is a public offense for a peace officer to use unreasonable and excessive force in effecting an arrest.' ") (citation omitted) (emphasis added); *People v. White*, 101 Cal.App.3d 161, 167 (Cal.Ct.App.1980).

For all of the aforementioned reasons, Plaintiff has already explained above, Defendant used excessive, negligent force against Plaintiff.

### III.    CONCLUSION & RELIEF REQUESTED

For all of the aforementioned reasons, Plaintiff respectfully requests that this Court GRANT Plaintiff's Motion for Partial Summary Adjudication that: (1) Defendant Antonetti SEIZED

Plaintiff in the Trader Joe's Parking Lot; (2) Defendant Antonetti SEIZED Plaintiff without probable cause of the bridge after 51st Street; (3) Defendant Antonetti used EXCESSIVE FORCE with her bike when she struck Plaintiff and/or kept the crowd from dispersing; (4) Plaintiff proved the liability portion of her Fourth Amendment and negligence claim.

Dated: November 30, 2022             POINTER & BUELNA, LLP
                                     LAWYERS FOR THE PEOPLE

                                     /s/ Patrick Buelna
                                     PATRICK M. BUELNA
                                     ATTORNEY FOR PLAINTIFF